UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CHRISTOPHER A. STANTON, <br><br> Plaintiff, <br><br> v. <br><br> INDIANA DEPT. OF CORRECTIONS, et al., <br><br> Defendants. | CAUSE NO.: 3:16-CV-743-PPS-MGG |

OPINION AND ORDER

Christopher A. Stanton, a prisoner without a lawyer, proceeds on an Eighth Amendment claim of deliberate indifference to his serious medical needs against Barbara Eichmann and Charles Dalrymple. He alleges that Dr. Eichmann and Dalrymple were aware of his mental condition and deprived him of psychiatric medication and housing accommodations in a single or double cell from January 18, 2016, to July 20, 2016, at the Westville Correctional Facility. Both sides seeks summary judgment. On the one hand, Stanton argues that the defendants acted with deliberate indifference by denying his requests to be housed in a single or double cell and by denying his requests for medication. For their parts, the defendants argue that they provided medical treatment in accordance with their medical judgment, and this fact precludes summary judgment.

Factual Background

Barbara Eichmann worked as a psychiatrist at the Westville Correctional Facility. ECF 69-1 at 1. Charles Dalrymple worked as a mental health therapist at the same facility. Dr. Eichmann and Dalrymple each submitted an affidavit (ECF 69-1, ECF 69-3) and the relevant medical records (ECF 69-2), which revealed the following.

The Westville Correctional Facility provides specialized housing for inmates determined to be significantly impaired by mental illness in the Special Needs Acclimation Program ("SNAP") Unit. ECF 69-3 at 3. Though Dalrymple could make placement recommendations, the lead psychologist and correctional staff ultimately determined whether an inmate would be placed in the specialized housing. *Id.* Dr. Eichmann was not involved with this decision-making process. ECF 69-1 at 1.

According to the defendants' expertise, the symptoms of antisocial personality disorder include the tendency to manipulate and treat others harshly or with callous indifference, aggressive or violent behavior, lying, impulsive behavior, inability to sustain consistent work behavior, and substance abuse. *Id.* at 3-4. No medication specifically treats antisocial personality disorder, but medication may be prescribed to treat the symptoms, including anxiety or depression. *Id.* Psychotherapy is also used to treat antisocial personality disorder. *Id.* Depression is a mood disorder with persistent feelings of sadness and loss of interest. *Id.* at 4. Symptoms include difficulty eating and sleeping, feelings of guilt or worthlessness, and thoughts of death or suicide. *Id.* It can be treated with antidepressants or psychotherapy. *Id.*

2

Posttraumatic stress disorder (PTSD) is a disorder that develops in individuals who experience a shocking or traumatic event. *Id.* Symptoms, which may be latent and may occur sporadically, include intrusive memories of the event, avoidance of the traumatic event, negative changes in thinking or mood, and changes in physical and emotional reactions. *Id.* Flashbacks and dissociation may also occur, but violence during flashbacks is extremely unusual. *Id.* Bipolar disorder is a brain disorder that causes mood swings, including manic episodes, in which an individual has increased energy and activity levels; depressive episodes, in which an individual feels depressed and has decreased energy levels; and mixed episodes, in which an individual experiences both manic and depressive symptoms. *Id.*

On October 8, 2015, Stanton underwent a psychological intake evaluation at the Reception Diagnostic Center. ECF 69-2 at 199-201. A mental health counselor noted Stanton's history of using suicidal intent and self-harm to manipulate his housing assignments during his previous term of incarceration. *Id.* Stanton reported a history of psychotropic medication and several diagnoses, including anxiety, post-traumatic stress syndrome (PTSD), bipolar disorder, borderline personality disorder, and antisocial personality disorder. *Id.* On October 12, 2015, Stanton underwent an initial psychiatric evaluation. *Id.* at 1-6. He was diagnosed with major depressive affective disorder and polysubstance dependence and was prescribed Celexa to reduce stress and anxiety. *Id.*

While tedious, in order to fully appreciate the extent of the attention that Stanton received from mental health providers, it is important to go through the chronology of events. So here goes: On October 27, 2015, Stanton was transferred to the Westville

Correctional Facility and was placed in general population. *Id.* at 7-8. On November 2, 2015, Dr. Eichmann discontinued Celexa because Stanton had refused it. *Id.* at 17. He explained that he did not believe he needed it if he was able to keep busy. *Id.* On November 3, 2015, Stanton met with Gary M. Durak, Ph.D., and reported no mental health symptoms and repeated that he did not need Celexa. *Id.* He also reported previous suicide attempts but he admitted that he engaged in self-mutilating behavior to facilitate housing changes. *Id.* He reported that, when he was eight years old, he witnessed the murder of his grandfather. *Id.* But the psychologist observed no symptoms of PTSD and assessed major depressive affective disorder and polysubstance dependence. *Id.*

On November 19, 2015, Stanton again told Dr. Eichmann that he felt fine without medication and wanted to continue without it. *Id.* at 25-29. On December 29, 2015, during an individual therapy session, Stanton revealed that previous suicide attempts were not motivated by suicidal intent but were intended to achieve a desired result. *Id.* at 30-33. The statements by Stanton that he did not need any medication and his repeated admissions that, in the past, he used his mental health to achieve some ulterior goal, later informed many of the decisions made by Dalrymple and Dr. Eichmann.

On January 18, 2016, Stanton was moved to segregation following a disciplinary incident. *Id.* at 34-35. On the same day, Stanton submitted a request to be moved to segregation, stating that he could not tolerate an open dormitory and that he would assault a correctional officer if necessary. *Id.* at 160. Three days later, Stanton submitted a request to be moved to a single or double cell. *Id.* at 161. Dalrymple responded that he

would speak to Stanton during weekly rounds and explained that mental health staff had no say on housing assignments. *Id.*

On January 29, 2016, Stanton submitted a request, stating that he could not tolerate an open dormitory due to post-traumatic stress syndrome (PTSD) and anxiety and that he would stab somebody if necessary. *Id.* at 162. He stated that he wanted "to see the head doctor not no therapist flunky." *Id.* At Stanton's cell, Dalrymple told Stanton that the mental health unit could recommend housing accommodations but that housing decisions were ultimately made by the administration. *Id.* at 45-46. Stanton responded, "I guess I'll just have to keep stabbing people." *Id.* Dalrymple thought he was being played by Stanton. He found Stanton's behavior to be consistent with antisocial personality disorder and forwarded the housing request to the lead psychologist. *Id.*

On February 14, 2016, Stanton submitted a request to speak to a therapist. *Id.* at 163. Dalrymple responded that he would see Stanton no later than February 23. *Id.* On February 23, 2016, Dalrymple noted that the medical records did not include a PTSD diagnosis but forwarded Stanton's housing request to the lead psychologist.[1] *Id.* at 53-56. On February 27, 2016, Stanton submitted a request, stating that he would be released from segregation in fifteen days. *Id.* at 164. He stated that, if he was placed in an open

---

[1] The medical records indicate that Dalrymple met with Stanton on February 23, 2016, but Stanton denies that Dalrymple met with him in response to his medical request from February 14. For purposes of this order, the court will assume that the in-person meeting did not occur.

dormitory and received another disciplinary write up due to PTSD, he would file a lawsuit. *Id.* Dalrymple forwarded the housing request to the lead psychologist. *Id.*

On March 5, 2016, Stanton submitted a request, seeking an update on his housing request. *Id.* Dalrymple told Stanton once again that the mental health department did not determine housing assignments. *Id.* A few days later, Dalrymple met with Stanton at his cell and informed him that correctional staff ultimately determined housing assignments and that his case manager was working on this issue. *Id.* at 61-63. The following day, Stanton submitted a request, stating that mental health *did* have the authority to dictate housing assignments, citing a document from another lawsuit, and threatened that he was going to contact the ACLU. *Id.* at 166. Dalrymple responded that the terms of that other lawsuit did not apply to Stanton. *Id.* Stanton and Dalrymple met again the following day, and Stanton told Dalrymple that he had bipolar disorder and denied ever seeing a psychologist since transferring to the Westville Correctional Facility. *Id.* at 64-66. Dalrymple noted that no records indicated diagnoses for bipolar disorder or PTSD but that the records did indicate that Stanton had seen a psychologist in November 2015. *Id.* Once again, Dalrymple noted that he found Stanton's behavior to be consistent with antisocial personality disorder. *Id.*

Because Stanton transferred to a different unit, Dalrymple did not interact with Stanton again until April 20, 2016. ECF 69-3 at 11. Dalrymple did not recommend Stanton for placement in the SNAP Unit because his symptoms did not suggest that such placement was required. *Id.* From Dalrymple's perspective, Stanton, who frequently exhibited argumentative and demanding behavior, presented with the

6

symptoms of antisocial personality disorder rather than the symptoms of PTSD or bipolar disorder. *Id.*

On March 15, 2016, a psychologist reviewed Stanton's treatment plan, and Stanton attended an individual therapy session. *Id.* at 68-72. On April 4, 2016, Stanton submitted a request, stating that he needed mental health assistance due to family issues and that he would "do something messed up" if he was "not locked up and stripped of everything." *Id.* at 76. On April 7, 2016, Stanton received a disciplinary write up for threatening correctional staff. *Id.* at 77. On April 11, 2016, Stanton attended an individual therapy session. *Id.* at 78-80. On April 12, 2016, Stanton received another disciplinary write up -- this one for refusing an order. *Id.* at 81.

On April 19, 2016, Stanton assaulted a correctional officer and was then placed in segregation. *Id.* at 82-83. On April 20, 2016, Stanton submitted a request, stating that he was going to file a lawsuit because the mental health staff allowed his PTSD to result in the loss of good time credit. *Id.* at 169. Specifically, he explained that he blacked out and had a flashback when the correctional officer grabbed him and that he had the correctional officer in a headlock when he regained consciousness. *Id.* On April 23, 2016, Stanton submitted a request, declaring that he would start a hunger strike until he was transferred to another correctional facility and until his medical needs were satisfied. *Id.* at 167. A nurse observed that that Stanton became upset after learning that the physician had stopped insulin orders. *Id.* at 95-96. Stanton refused all food and medication. *Id.* On April 25, 2016, Stanton stated he would not eat until he was transferred to a different facility and explained that he assaulted to correctional officer

7

because he could not tolerate general population. *Id.* at 101-02. However, Stanton abandoned the hunger strike later that day. *Id.* at 103-04.

On April 26, 2016, Dalrymple met Stanton at his cell and Stanton explained that he assaulted the correctional officer after he learned that he was being transferred to an open dormitory and blacked out. *Id.* at 109-10. He further complained about stress, anxiety, and PTSD. *Id.* Dalrymple agreed to an out-of-cell visit no later than May 3, 2016. *Id.* On that date, Stanton asked Dalrymple for medication for his mental condition. *Id.* at 113-15. He also complained about the lack of available coping strategies as he did not have a stress ball, punching bag, or enough space to exercise; he also complained about his relationship with his family. *Id.* Dalrymple advised Stanton to consider both the positive and the negative aspects of his situation and discussed stress-reducing strategies. *Id.* He observed Stanton's anxious behavior and forwarded the request for medication to the lead psychologist and Dr. Eichmann. *Id.*

On May 17, 2016, Dalrymple saw Stanton at his cell, and Stanton again requested a transfer to a different facility or placement in a single or double cell. *Id.* at 116. On May 22, 2016, Stanton submitted a request, asking when he would see the physician to discuss medication for his PTSD, anxiety disorder, and bipolar disorder. *Id.* at 171. He reported that he was experiencing flashbacks to his grandfather's murder, mood swings, and anxiety. *Id.* Dalrymple responded that he would consult Dr. Eichmann when she returned from medical leave. *Id.*

On June 3, 2016, Dalrymple met with Stanton at his cell and Stanton complained of bipolar disorder, anxiety, and PTSD. *Id.* at 125-26. Stanton asked when he would

8

meet with the psychiatrist and told Dalrymple that he was filing a lawsuit about his mental health care. *Id.* Dalrymple responded that he would see Dr. Eichmann when she returned from medical leave and noted that Stanton's behavior was consistent with antisocial personality disorder. *Id.* On June 6, 2016, Dr. Eichmann returned from medical leave. ECF 69-1 at 5. On June 16, 2016, Stanton submitted a request asking when he would see the physician for medication. *Id.* at 174. Dalrymple told Stanton that he had not received a response from Dr. Eichmann. *Id.*

On June 24, 2016, Dalrymple saw Stanton at his cell at Stanton's request. *Id.* at 132-34. Stanton complained that correctional staff had harassed him and stated that he would commit suicide if he or the correctional officers were not moved. *Id.* Based on Stanton's prior conduct, Dalrymple found that Stanton was attempting to manipulate his housing assignment and declined to place Stanton on suicide observation. *Id.* On June 25, 2016, Stanton submitted a request, asking when he would see a physician for medication. *Id.* at 177. He also complained of depression, lack of energy, and excessive sleeping. *Id.* at 175. On June 27, 2016, Dalrymple saw Stanton at his cell at Stanton's request. Stanton complained about correctional staff and stated that he would commit suicide if he did not see the captain. *Id.* at 135-36. Dalrymple responded that he would inform the captain of Stanton's concerns but declined to place Stanton on suicide observation. *Id.*

On July 8, 2016, Dalrymple informed Stanton that Dr. Eichmann determined that Stanton did not need medication. *Id.* at 177. Dr. Eichmann reviewed the medical records and determined that psychotropic medication was not medically indicated for Stanton.

9

ECF 69-1 at 5-6. The medical records did not reveal manic or depressive phases to indicate bipolar disorder and did not reveal significant anxiety or depression to indicate PTSD. *Id.* Instead, Stanton appeared to be manipulating his mental health issues for secondary gain, and psychotherapy adequately managed Stanton's mental condition. *Id.*

On July 10, 2016, Stanton informed Dalrymple that he would file a lawsuit against him for denying medication. ECF 69-2 at 176. Dalrymple responded that Dr. Eichmann ultimately determined whether Stanton would receive medication. *Id.* On July 15, 2016, Dalrymple saw Stanton at his cell and Stanton asked about his housing requests, his request for a transfer, and psychiatric medication for bipolar disorder and PTSD. *Id.* at 145-46. Dalrymple responded that Dr. Eichmann made medication determinations and that those diagnoses were not in his medical records. *Id.* He found Stanton's behavior to be consistent with antisocial personality disorder. *Id.* On July 20, 2016, Stanton transferred to the Indiana State Prison. *Id.* at 147-51.

I have also reviewed Stanton's verified amended complaint and the exhibits attached to his motion for summary judgment and previous complaints. He has attached medical records from Larue D. Carter Memorial Hospital regarding his eighteen-month psychiatric hospitalization that began when he was twelve years old. ECF 55-2 at 13-38. The records describe "volatile, aggressive behavior" during his stay, an abusive childhood, and multiple prior psychiatric hospitalizations. *Id.* He was discharged with diagnoses of oppositional defiant disorder and developmental articulation disorder and a prescription for Moban. *Id.*

Stanton's exhibits also include medical records from his previous term of incarceration. According to a Department of Corrections medical record from June 8, 2007, a physician assessed Stanton with depression, PTSD, polysubstance dependence, and antisocial disorder and prescribed haloperidol and depakene. *Id.* at 3. According to a physician's note from June 16, 2007, Stanton was to be placed in a single cell for a temporary psychiatric hold. *Id.* at 12. The physician further described Stanton as "violent, threatening, manipulative along with [psychiatrically] impaired judgment" and "offender continues to be a severe disciplinary problem, extremely manipulative, voicing continued intent to react to staff in a threatening and assaultive basis." *Id.*

According to a disciplinary report, on April 19, 2016, a correctional officer was called to Stanton's cell because Stanton was refusing to move to a different dormitory. ECF 1-1 at 9. When the correctional officer attempted to put handcuffs on Stanton, he was elbowed in the face. *Id.*

Stanton states that he is now receiving proper mental health treatment at the Wabash Valley Correctional Facility. ECF 72. He has prescriptions for Minipress to address night terrors caused by PTSD and for Geodon to address mood swings caused by bipolar disorder, and he is housed in the special needs unit. *Id.*

Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

11

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

Stanton alleges that Dr. Eichmann and Dalrymple acted with deliberate indifference to his serious medical needs regarding his mental health with respect to his need for a single or double cell and psychiatric medication. The defendants argue that they did not act with deliberate indifference in treating Stanton. Far from it. They *actively* treated Stanton and relied on their medical judgment in the process. Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994.) A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and if untreated could result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

Deliberate indifference is a high standard, and is "something approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the defendants have provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Synder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

Cell Assignments

Stanton alleges that the defendants acted with deliberate indifference by not housing him in a single or a double cell. Significantly, the record indicates that Dalrymple was the only defendant involved with Stanton's housing requests and that his role was limited to forwarding the requests to the lead psychologist and correctional staff and making recommendations. Thus the relevant issue is whether Dalrymple's decision to not recommend specialized housing for Stanton constituted deliberate indifference. Additionally, the record indicates that Stanton was housed in a single cell at the Westville Correctional Facility from April 19, 2016, to the date of his transfer, and Dalrymple and Stanton did not interact between March 10, 2016, and April 19, 2016. Therefore, the focus of the inquiry is what Dalrymple knew of Stanton's mental condition as of March 10, 2016.

According to his affidavit, Dalrymple did not recommend Stanton for placement in the SNAP Unit because his symptoms did not suggest that such placement was required. He states that, Stanton, who frequently exhibited argumentative and demanding behavior, presented with the symptoms of antisocial personality disorder rather than the symptoms of PTSD or bipolar disorder.

The record reflects that Dalrymple relied on the medical records from Stanton's most recent term of incarceration from 2015. These medical records indicate that Stanton was diagnosed with major depressive affective disorder and polysubstance dependence by a psychiatrist and then by a psychologist even after Stanton reported previous diagnoses of PTSD and bipolar disorder. The medical records also document Stanton's admissions that he had complained about his mental health for the purpose of manipulating his housing assignments during his previous term of incarceration.

Though Dalrymple was aware of Stanton's complaints about PTSD and bipolar disorder, Stanton coupled these complaints with housing requests and allusions to violence. Indeed, Stanton's statements often resembled threats of intentional violence rather than requests based on medical need. For example, Stanton made the following threatening statements:

- I'm about to do something stupid to go to segregation to get out of this open dorm bullshit. If not moved, I'll soon catch an outside case on an officer to get moved out of this open dorm shit.

- My PTSD and anxiety is not going to handle open dorm. This is a promise. If need be, I'll stab someone to stay in a one to two man cell.

- I guess I'll just have to keep stabbing people.[2]

Stanton's course of conduct provides a substantial basis for Dalrymple's belief that Stanton presented with antisocial personality disorder and was merely attempting to manipulate his housing assignments. By contrast, Dalrymple had little reason to suspect that Stanton suffered from PTSD or bipolar disorder. Stanton may have reported that he was previously diagnosed with these disorders, but he never complained of associated symptoms, such as mood swings, a triggering traumatic event, or flashbacks. Additionally, even if Dalrymple was aware of the prior diagnoses, it was reasonable for him to rely on the more recent medical assessments instead of medical records from 2007 or earlier, particularly when those prior diagnoses were inconsistent with his objective findings. Moreover, despite his concerns, Dalrymple forwarded Stanton's housing requests for the lead psychologist's consideration.

In sum, the record does not demonstrate that Dalrymple acted with deliberate indifference. Quite the opposite. The record shows that Dalrymple handled Stanton's housing requests consistent with his medical judgment. Therefore, with respect to the claim that the defendants acted with deliberate indifference in relation to cell assignments, the defendants' motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied.

---

[2] According to the medical records, Stanton made this statement in response to being told that mental health did not make housing decisions.

Psychiatric Medication

Stanton alleges that Dr. Eichmann acted with deliberate indifference by discontinuing and not reinstating psychiatric medication.[3] The record indicates that Dr. Eichmann assessed Stanton's need for medication on three occasions. On November 2, 2015, Dr. Eichmann discontinued Celexa on the basis that Stanton had refused it because he did not believe he needed it if he kept busy. On November 19, 2015, Stanton told Dr. Eichmann that felt fine without medication and wanted to continue without it, and Dr. Eichmann acquiesced. These assessments do not suggest deliberate indifference.

With respect to the decision in July 2016, Dr. Eichmann reviewed the medical records and determined that psychotropic medication was not medically indicated for Stanton. She reasoned that the medical records did not reveal manic or depressive phases to indicate bipolar disorder and did not reveal symptoms, including significant anxiety or depression, to indicate PTSD; instead, Stanton appeared to be manipulating his mental health issues for secondary gain, and psychotherapy adequately managed Stanton's mental condition.

The medical records provide an ample basis to support Dr. Eichmann's reasoning. Considering Stanton's history of manipulating staff by fabricating or exaggerating mental health symptoms, medical staff had good reason to question

---

[3] To the extent Stanton asserts this claim against Dalrymple, summary judgment is granted in favor of Dalrymple and against Stanton. The record demonstrates that Dalrymple, who lacked the authority to prescribe medication, responded reasonably by forwarding the requests to other medical staff.

Stanton's complaints and to seek confirmation from another source. In light of Dalrymple's expertise, his frequent interactions with Stanton, and his detailed notes, it was reasonable for Dr. Eichmann to rely on the medical records. The medical records indicate that Stanton complained of mood swings and depression but do not indicate that any medical staff observed these symptoms. Though Dalrymple once observed anxious behavior upon Stanton's return to segregation, Dalrymple offered coping strategies, and the medical records include no further objective signs of anxiety. Given the circumstances, Dr. Eichmann's conclusion that Dalrymple did not need medication was reasonable.

In sum, the undisputed record indicates that Dr. Eichmann denied Stanton medication based on her medical judgment. Stanton clearly believes that Dr. Eichmann made the wrong decision, and, considering Stanton's mental health history, perhaps she did. But the relevant inquiry is whether Dr. Eichmann acted with deliberate indifference, and, on this evidentiary record, no reasonable jury could conclude that Dr. Eichmann's decision was "so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *See Jackson*, 541 F.3d at 697-98; *Hayes*, 546 F.3d at 524. Therefore, with respect to the claim that the defendants acted with deliberate indifference in relation to psychiatric medication, the defendants' motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied.

For these reasons, the court:

(1) GRANTS the defendants' motion for summary judgment (ECF 69);

(2) DENIES the plaintiff's motion for summary judgment (ECF 55);

(3) DENIES the motion for a jury trial (ECF 73); and

(4) DIRECTS the clerk to enter judgment and to close this case.

SO ORDERED on August 30, 2018.

s/ Philip P. Simon  
JUDGE  
UNITED STATES DISTRICT COURT